# Harris v. Commonwealth.

(Decided December 19, 1930.)

J. B. WALL, H. M. BROCK, J. M. JONES and ELMON MIDDLE-TON for appellant.

J. W. CAMMACK, Attorney General, and DOUGLAS VEST for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Affirming.

At his trial in the Harlan circuit court under an indictment charging him with murdering Frank Allen, the appellant and defendant below, Bradley Harris, was convicted and punished by confinement in the penitentiary for life. His motion for a new trial was overruled,

and he has appealed and urges through his counsel four grounds for reversing the judgment, which are: (1) Error in overruling his motion for a continuance; (2) that the verdict is not sustained by sufficient evidence; (3) error in admitting incompetent evidence offered by the commonwealth; and (4) error in rejecting competent evidence offered by defendant—each of which will be disposed of in the order named.

1. The killing occurred at about 7 p. m. on a Sunday in January, 1930, and defendant was indicted on the 18th day of the following March, and his trial was had twenty days thereafter on April 7. Upon calling of the case for trial defendant asked for a continuance because of absent witnesses, and filed his affidavit setting out the names of some persons who would testify to threats previously made by deceased against him and the names of others who would testify to certain facts in support of the defense that the shooting was in the exercise of defendant's right of self-defense. All of the witnesses resided in Harlan county, some of whom it was stated in the affidavit had been subpoenaed, while others had not, but which of them were served and which were not was not made to appear. The absent witness as to what occurred at the time of the killing and by whom defendant's right of self-defense was sought to be supported, appeared at the trial and testified in defendant's behalf, and one or more of the others by whom previous threats were expected to be proved also appeared and testified at the trial, and the affidavit as to the testimony of all the others who did not so appear at the trial, relating to such prior threats, was read as the testimony of the absent ones. Other witnesses appeared at the trial and testified to the same point, i. e., previous threats made by deceased against defendant. In the circumstances, viewed in the light of the settled practice as sanctioned by legislative enactment of section 189 of the Criminal Code of Practice, it is impossible for us to discover wherein the court abused a sound discretion in pursuing the course it did by overruling the motion with leave for defendant to read the affidavit of such of his witnesses as did not appear at the trial. Ample time was given for preparation, and if the testimony of the witnesses who did not appear at the trial and whose testimony as incorporated in the affidavit was read would have varied as much from what was stated in the affidavit as did the testimony of those who did appear at the trial, it is mani-

fest that defendant was benefited by their absence, and upon the whole we are by no means convinced that the court abused a sound discretion in overruling the motion for a continuance upon condition that defendant could read his affidavit as the testimony of the absent witnesses.

2. Defendant was married to the wife with whom he was living at the time of the killing in 1917. Not long thereafter he became a soldier in the World War and was absent from home for about 18 months. During his absence a boy child was born to his wife, about 7 months after the date of their marriage. He then and has since contended that he was not the father of that child, but that deceased, who had been a sweetheart of his wife before their marriage, was its father, and all of which he claims his wife admitted to him after his return from the war. The child continued to live at the home of defendant and at the time of the trial he was about 12 years of age. Defendant claims that deceased from time to time continued to visit his wife up to the very day of the killing, but, if true (and there is no superabundant amount of proof concerning it), the defendant, it would seem, condoned such relationship and it does not appear to have oppressed or seriously disturbed him for the entire period of his married life up to the date of the killing. But however that may be, it is so well established that such conduct on the part of the offender does not forfeit his life at the hands of the one so wronged by him, that we do not deem it necessary to incumber the opinion with fortifying cases. However, the law, out of merciful consideration because of well-known characteristics of human nature, permits such conduct on the part of the deceased to be proven and relied on by his slayer in mitigation of the degree of the homicide and of the punishment inflicted, i. e., a reduction of the homicide from malicious murder to voluntary manslaughter committed under the heat of passion beyond control.

On the fatal Sunday morning appellant left home and went to that of his friend, a Mr. Hicks, where he says he remained until late in the afternoon when he started for his home, but detoured by the post office in Harlan and shortly after leaving it he saw deceased talking to his sister on the sidewalk. He started across, according to his testimony, to speak to his sister with reference to their mother's illness, when he met deceased, who had

just separated from conversing with the sister, when this happened:

"Frank says to me 'You have caught me again.' I says 'Yes, I have.' I says, 'You go ahead and not bother me and my folks anymore, I don't want no trouble with you whatever.' I says, 'My sister and my wife get along and don't mess me up, I don't want no trouble with you.'

"Q. What did he say and do? A. He jumped backward two or three jumps away from me and said 'God damn you, I will burn the rags off of you.'

"Q. What did you do? A. I didn't do anything but shoot him, I pulled my revolver and shot three shots."

He was then asked why he shot the deceased, and he stated that the only "particular reason" was that he thought his life was in danger, and that he was so torn to pieces that he hardly realized what he was doing. Defendant first admitted that he was not offended because deceased conversed with his sister and that he did not shoot him for any such reason, but that he did so because, as he believed, his life was in danger. He was then asked:

"Q. This (personal danger) is the only reason you shot him? A. Not altogether."

He was then asked to state what other reason prompted him to do the shooting, and answered: "Over trouble he had caused me and my wife." And on being further pressed he stated that he had two reasons for the shooting, one to protect himself from imminent danger at the hands of the deceased, and the other because of the latter's supposed associations with his wife.

To some extent defendant was corroborated as to what occurred at the time of the shooting by the testimony of his sister, but she did not see it because she had entered a store, but she testified to a remark claimed to have been heard by her and made by deceased. Another witness said that when the parties met he heard Allen say, "God damn you," but that witness also said that deceased had no weapon, nor did he have his hands in his pockets or make any effort to harm defendant, who immediately commenced to shoot after deceased made the above remark. Some ten or twelve eyewitnesses to the

entire transaction testified that defendant approached Allen, who was standing at the edge of the sidewalk with one hand against a post, and immediately commenced shooting him, and fired three shots into his body when deceased fell from the sidewalk on the street and was later carried to the hospital where he soon died. From the testimony as so briefly outlined it is clear that there is no support for the contention made in ground 2.

3. The alleged incompetent evidence complained of in ground 3 consisted in testimony given by some of the witnesses who stated that immediately after deceased was delivered to the hospital he was undressed and no weapon of any character was then found upon him. It is also complained that other witnesses testified to the absence of any weapon about or near his body, though they did not see it lying on the street until after others had preceded them, and because of which it is argued that such testimony was not reliable, since if deceased had a weapon it could have been removed beforehand. The same argument is made with reference to the same character of testimony as to discoveries after the arrival at the hospital. But a very brief time intervened between the shooting and the arrival of the body of the deceased at the hospital, and we are unable to see wherein any of the complained of testimony was irrelevant or prejudicial. When the body of deceased was undressed was an opportune occasion for the discovery of a concealed weapon, and a time when it was appropriate to prove, as we conclude, that he had or did not have upon his person such a weapon. Those who made only a sight observation, as well as those making only a cursory one at the point where deceased fell, had already testified that they neither saw nor discovered any weapon upon or about him, which, however, was not positively conclusive that he had none upon his person, and which fact was demonstrated by the more thorough examination made at the hospital when all of his clothing was removed. We are unable to see wherein the testimony complained of in support of this ground was incompetent.

4. The only rejected evidence offered by defendant and complained of in ground 4 that is available on this appeal (there being no avowal as to other instances complained of) was to this question propounded to defendant: "Did you hear of him making any threats against

you on the day of the killing?'' To which the objection of the commonwealth was sustained with exceptions, and counsel avowed that, ''if the witness was permitted to answer he would truthfully state that he heard that he was going to kill him.'' Defendant had already testified to having heard of such alleged threats by deceased and the rejected evidence as incorporated in the avowal, if otherwise competent, would have been only in addition to similar testimony already given by defendant. It will be noted, however, that the avowal stated only that defendant had *heard* that the deceased was going to kill him, and not that the deceased had *said* that he intended to kill him. The substance of the avowal may have been only but the conclusions of defendant's informant and not a reproduction of an express threat against defendant made by deceased. But, however that may be, we conclude that in view of the other admitted evidence upon the same fact, and in view of the overwhelming evidence as to how the killing actually occurred, the error complained of in support of ground 4, if not subject to the criticism above pointed out, was not prejudicial and could not and did not effect the verdict of the jury, since after all practically the only issue for its determination was whether the killing was maliciously done, or done under such provocation as to reduce it to voluntary manslaughter. It was one essentially triable by the jury under the instructions given by the court of which no complaint is or could have been made, and we find that there is no merit in this ground.

It was complained in the motion for a new trial that one of the jurors who sat in the case had previously formed and expressed an opinion, but the court heard testimony with reference thereto and overruled the motion, and on this appeal no reference whatever is made to it, from which we conclude that the decision of the court has been accepted and the ground itself abandoned.

Finding no error prejudicial to defendant's substantial rights, the judgment is affirmed.